NORRIS, Judge.
The plaintiff, Peter Hartman, appeals a judgment that rejected his claims for weekly benefits and medical expenses under the workers compensation statute. He argues that the trial court committed manifest error in finding him not disabled and in not awarding him necessary medicals. Unable to find manifest error on the part of the trial court, we affirm the judgment.
FACTS
Hartman is a manual laborer who was 27 years old at the time of this accident. In July 1982 he was working the night shift at Dittco Doors. With two fellow employees he was sweeping sawdust from the entrance of an elevated hopper. When they were finished, they were climbing down the ladder to the ground. Hartman lost his footing and fell 20 to 25 feet to the sawdust-covered dirt floor. He landed on his feet and experienced sudden, excruciating pain. Unable to walk, he was carried to the hospital where he was diagnosed as having a dislocated left ankle with no fracture. The ankle was promptly reduced and placed in a cast. Hartman stayed in the hospital about five days; when he was discharged, he was still taking pain medication.
Dittco’s insurer, Insurance Company of North America (INA), covered this hospitalization and began paying weekly benefits of $124. INA paid benefits regularly for over a year while Hartman was undergoing treatment from various doctors.
Hartman’s ankle made very slow progress. The treating physician, Dr. J.E. Smith of the Fox-Dean Clinic, removed the cast in August and sent Hartman to physical therapy that produced only marginal results. With slight movement, the ankle joint would pop, swell and change colors. Even when it was not swollen, the ankle got cold easily. By October, however, Hartman was off his crutches; he still complained of some pain and swelling. Dr. Smith’s associate, Dr. Fox, examined Hartman and noted possible reflex sympathetic dystrophy, a disorder of the sympathetic nervous system that manifests itself at an old injury site, producing discoloration, swelling and hypersensitivity out of proportion to the objective condition of the bone, joint or tendon. Dr. Smith, however, discounted this possibility, feeling that Hartman’s symptoms were not really consistent with reflex sympathetic dystrophy. He injected Hartman with a pain-killer, Xylo-caine, that seemed to give relief. This suggested to him that the problem was with the ankle and not with the sympathetic nervous system. He thought Hartman’s real problems were osteoporosis and arthritis, and he considered performing a fusion. In January 1983, however, he ran an arthroscope that was negative, and decided not to recommend the surgical procedure. Un *425 til the arthroscopy, Dr. Smith believed that Hartman’s continued complaints of pain were sincere; afterwards, however, he felt that any lingering problem in the ankle should resolve itself without further attention. He felt by February that Hartman could attempt to return to work.
Around this time Hartman began to complain of other problems, some of which were not medical. In March 1983, both Hartman and his wife were arrested on marijuana charges. He eventually pled guilty to distribution of marijuana and received a sentence of three years at hard labor, suspended with three years of supervised probation. Soon after the arrest, he began to complain of debilitating headaches, severe depression, nightmares and suicidal thoughts. His attorney sent him to Dr. Hayes, a psychiatrist, and to Dr. Gaddis, a neurologist. Dr. Hayes noted that Hartman was walking in a normal, steady gait when he saw him in July 1983. Hartman admitted to Dr. Hayes a history of migraine headaches and said he was taking 10 mg. of Valium daily. Based on the history given, Dr. Hayes noted possible post-traumatic depression and diagnosed post-traumatic stress disorder which he attributed to the accident. He felt that the resultant injury, disability and inability to work also contributed to the problem. Dr. Hayes stated in desposition that Hartman did not tell him he had been involved in a criminal prosecution and that this could easily be causing his frustration and emotional upset. Dr. Gaddis, the neurologist, prescribed some drugs, including Elavil. Hartman claimed that these drugs did not help him, although he reported to Dr. Hayes in June that the headaches were abating.
Meanwhile, Hartman was apparently dissatisfied with his treatment from Dr. Smith. He went to Dr. Castellano, a podiatrist. Dr. Castellano recommended surgery on the right foot to remove a “floating bone.” Dr. Smith did not approve of the surgery; Hartman had never complained of any problem in the right foot until six months after the accident, and therefore Dr. Smith felt this surgery was not connected with the accident. He also disapproved of treating Hartman “in conjunction with” Dr. Castellano. Nevertheless in May he released Hartman to Dr. Castellano’s care. Hartman underwent the surgery on his right foot in June. During his week-long stay in the hospital, the doctors noted his persistent requests for Valium, and restricted his drug intake. Hartman returned to Dr. Smith on August 24. Even though he still claimed to be limping and suffering from a dull, throbbing pain, Dr. Smith felt he was able to return to work without any restriction. He therefore gave Hartman a non-restricted work release with a 10% disability of the left ankle. On the strength of this release, INA discontinued weekly benefits.
Hartman nevertheless claimed to be still suffering from pain that never abated since the accident. Despite the pain he held jobs almost continuously after the work release. He folded laundry at a T-shirt shop, worked cutting meat at Sirloin Stockade, and was at the time of trial performing light maintenance work at a hotel in exchange for rent. He claimed he was unable to do anything involving prolonged standing or heavy labor because of the pain in his feet. However, the jobs he held since the accident were not very different from the ones he held before and were consistent with his ninth-grade education and his lack of other training. He nevertheless testified that whenever his ankle popped, he would have to elevate it and wait several hours for the swelling to recede. He said this happened three or four times a week, although he admitted working 25 hours a week at the time of trial. R.p. 211.
Because Hartman claimed the pain in his left ankle had never abated, his attorney sent him to Dr. Burda, a rheumatologist, in February 1985. Dr. Burda noticed a slight lack of mobility in the ankle and a slight swelling and tenderness. He thought the problem might be sympathetic dystrophy, which Dr. Fox had noted as a possible diagnosis in October 1982, but he also thought tendonitis of the heel was possible. In order to confirm his suspicion of sympathetic dystrophy, he sent Hartman to Dr.
*426 Green, an orthopedist. Hartman reported to Dr. Green that Dr. Burda had “diagnosed” sympathetic dystrophy. Dr. Green examined him, noted that the complaints of pain were out of proportion to any physical observations, and concluded that this symptom was consistent with the early stages of reflex sympathetic dystrophy. The principal objective symptoms are discoloration, which Hartman did not exhibit, and low skin temperature, which Hartman exhibited to a small degree in both feet but could be attributed to other problems. Dr. Green did not find any genuine physical problems. He could detect no popping when the ankle was moved, and a limitation of range of motion so slight that he could not consider it a restricting factor. The X-rays showed nothing unusual. Hartman did not complain to Dr. Green about his right foot.
Dr. Green recommended a series of sympathetic blockade tests in April 1985. The blockade consists of injecting an anesthetic such as Xylocaine into the back, around the sympathetic ganglia. The deadening interrupts the sympathetic chain, in effect stopping the function of the nerve in the ankle. Dr. Green told Hartman that the test was partly diagnostic, to establish the basis of the clinical suspicion, but partly therapeutic as well. He advised him that if sympathetic dystrophy was his problem, then the blockade would help; if not, the blockade would not give him any relief. Hartman underwent the blockade and reported splendid results, the first relief since the accident occurred in 1982. Out of caution, Dr. Green ran two more blockades; these were as successful as the first. In fact, Hartman reported that the third blockade gave him relief for three days, even though Dr. Green testified that he had never known it to produce effects for more than one day.
To remedy the situation, Dr. Green recommends a procedure called “sympathecto-my,” by which the trouble-causing sympathetic ganglia are surgically removed. This would produce the same effect as the blockade, except that it would be “relatively permanent.” R.p. 377. Dr. Green estimated that after the sympathectomy, Hartman would suffer no residual effects except for about 15% disability of the left foot, stemming from the dislocated ankle.
Hartman filed this suit in December 1983, demanding necessary medicals and weekly benefits, plus penalties, interest and attorney fees. His petition lists reflex sympathetic dystrophy as one of many diagnoses. Obviously Hartman did not “confirm” this diagnosis until he saw Drs. Bur-da and Green in early 1985, but their testimony was presented at trial in August 1985. Hartman also presented the testimony of his physical therapist to prove the genuineness of his complaints, in addition to that of his wife, two friends and himself.
The defense presented the testimony of Dr. Ware, an expert psychiatrist and neurologist. He saw Hartman at INA’s request in September 1983. He testified that at that time Hartman showed no evidence of psychological disease at all. He outlined Hartman’s medical history, pointing out the longstanding and pre-existent migraine headaches. Hartman had not reported to him the childhood accident and subdural hematoma, which he had reported to Dr. Hayes, but did report to Dr. Ware a serious auto accident in 1974 or 1975, which he had not mentioned to Dr. Hayes. Hartman denied any significant use of marijuana or alcohol. Dr. Ware concluded that if Hartman had headaches, they were due to tension. He also felt that the tension could be attributed to ordinary “adjustment disorder of adulthood.” R.p. 422. He was asked how the trauma of an arrest and criminal prosecution might affect a person’s well-being, and replied that this would be a significant omission from the medical history. Dr. Ware said there was no psychiatric or emotional basis for keeping Hartman from work. He also noted that Hartman was not limping in September 1983 and otherwise showed no signs of discomfort during the examination.
The defense also presented the deposition of Dr. Smith, Hartman’s treating physician. He acknowledged that Dr. Fox had suspected reflex sympathetic dystrophy' in October 1982, but he simply did not believe that Hartman’s symptoms supported the diagnosis. He said that after November *427 10, 1982 there was no prolonged swelling, no significant discoloration and no poor integrity of the skin that would ordinarily be associated with it. Other objective symptoms were likewise lacking. Hartman’s complaints were somewhat inconsistent, and Dr. Smith said he saw Hartman walking down the highway one day without any limp; this would not have been possible if the pain was genuine. He reiterated that there was no objective reason why Hartman could not return to the kind of work he had always done by August 1983, when he released him. Hartman returned to Dr. Smith in April 1984 with renewed complaints of pain after having “walked a long distance,” but Dr. Smith still did not detect reflex sympathetic dystrophy and still opined that he was able to return to work.
DISCUSSION
The trial court delivered written reasons for judgment. It addressed primarily the totally subjective nature of the alleged pain and Hartman’s general lack of credibility. The court concluded that any medical difficulties beyond the August 1983 release were based solely on Hartman’s subjective complaints, which were not supported by other evidence. Thus he failed to meet his burden of proving disability after the release. Since there was no disability, the court did not reach the issue of medicals.
This case is governed by the workers compensation statute as it stood before the 1983 amendments, LSA-R.S. 23:1221 (1975). Under this statute, the plaintiff must establish by a preponderance of evidence that the injury sustained was caused by the on-the-job accident. Martin v. H.B. Zachry Co., 424 So.2d 1002 (La.1982); West v. Bayou Vista Manor, 371 So.2d 1146 (La.1979). Absent proof of an intervening cause, a claimant’s disability is presumed to have resulted from an accident, if before the accident the injured person was in good health; if the symptoms of the disabling condition began at the time of the accident and continuously manifested themselves afterward; and if the medical evidence shows a reasonable possibility of causal connection between the accident and the disabling condition. Lucas v. Ins. Co. of N. Amer., 342 So.2d 591 (La.1977); 3 Larson, Law of Workmen’s Compensation, Sec. 80.33(d) (1983 ed.); Robertson v. Scanio Produce, 449 So.2d 459 (La.1984).
The presumption of causation is not irrebuttable; rather, once established, it shifts the burden of proof to the defendant. Haughton v. Fireman’s Fund, 355 So.2d 927 (La.1978); Robertson v. Scanio Produce, supra.
In evaluating the evidence, the trier of fact should accept as true the uncontra-dicted testimony of a witness, even though the witness is a party, where the record indicates no sound reason for its rejection. Robertson v. Scanio Produce, supra, and citations therein.
We have closely reviewed the evidence in this case. Like the trial court, we are unfavorably impressed by the frequent and significant inconsistencies in Hartman’s testimony. For example, he reported to Dr., Hayes on June 15 that he was feeling better, but on June 17 he told Dr. Gaddis his headaches were as bad as ever. It is difficult to determine which report is true. Earlier, in February 1983, Hartman had checked into the hospital with an injury to his arm, which the hospital report shows was sustained by arm-wrestling, but at trial he said what really happened was that his ankle gave out and he slipped and fell, injuring the arm. Hartman never told Dr. Hayes, Gaddis or Ware that he had been arrested on drug charges, although this would have been an important element of any treatment. What he did tell them was inconsistent and sometimes inaccurate. From all this the trial court was certainly entitled to make an assessment of Hartman’s credibility. In so doing it found his testimony and that of his wife and friends unreliable. From the cold record we cannot conclude that this finding is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
In addition to the credibility problem that plagued Hartman’s own testimony, we find that the medical evidence itself provides *428 grounds for affirming the trial court. Most important is the deposition of Dr. Smith. By August 1983 he was completely convinced that Hartman was cured and able to return to work without restriction. None of Dr. Smith’s tests, such as the X-ray and the arthroscopy, showed any physical irregularities. His visual examination likewise failed to find discoloration, swelling, hypersensitivity of the skin, poor integrity of the skin, or a shiny, swollen appearance, all of which are the hallmarks of the syndrome. Smith’s Dep., 9. The opinion of Dr. Smith, as the treating physician, is entitled to great weight. Attaway v. Farley’s Glass Co., 430 So.2d 705 (La. App. 2d Cir.1983).
The testimony of Dr. Green, while tending to favor Hartman’s complaints, is not entirely convincing. He admitted that his diagnosis was subjective and based solely on Hartman’s credibility with respect to his complaints of pain. Dr. Green also operated under the mistaken impression that Dr. Burda had in fact diagnosed the syndrome. Hartman himself was responsible for this misimpression, and this detracts from Dr. Green’s diagnosis as well as from Hartman’s credibility.
Even if we accepted the diagnosis of Drs. Green and Burda, we would not be able to conclude more probably than not that the syndrome truly arose from the accident. Dr. Green diagnosed “early sympathetic dystrophy.” R.p. 368. However, Dr. Bur-da explained that the early or edematous stage would last about six months and would have set in within three months after the cast was removed. R.p. 319, 325. By this standard., the early or edematous stage should have set in by November 1982 and ended by May 1983. Drs. Green and Burda were examining Hartman in early 1985, considerably after the “early” stage should have abated. Dr. Burda also described a middle or dystrophic stage, and a final or atrophic stage, which would have set in over a year after the trauma. Based on this information, we might assume that Hartman was in the atrophic stage by the time Drs. Green and Burda saw him. Dr. Burda said that in the atrophic stage, nothing can be done for the patient. R.p. 321. But since Dr. Green’s sympathetic blockades were reportedly effective, Hartman cannot have been in the atrophic stage.[1]
As for the results of the blockade tests, Dr. Green admitted that Hartman knew of the possible results in advance. R.p. 374. The fact that Hartman knew what to expect and how to react, together with his report of incredibly long-lasting relief, lead us to suspect even more the results that he reported.
We reiterate the legal standard of Robertson v. Scanio Produce, supra. The plaintiff’s subjective complaints of pain may satisfy his burden of proof if the record indicates no sound reason to reject them. However, Hartman’s credibility was seriously questioned because of inconsistent statements and actions. Under the circumstances of this case, the trial judge was not manifestly erroneous in disbelieving Hartman’s testimony about pain. Without these subjective complaints, Dr. Burda’s and Dr. Green’s testimony is too inconclusive to support a diagnosis of reflex sympathetic dystrophy. Dr. Smith’s opinion soundly refutes that diagnosis. We cannot say that the trial court was clearly wrong in finding that Hartman’s disability had ended by August 24, 1983 and in rejecting all subsequent claims for weekly benefits and medical expenses.
For these reasons we affirm the judgment of the trial court at appellant’s costs.
AFFIRMED.

. Apparently Hartman misrepresented the age of his injury to Dr. Burda. At one point during trial, Dr. Burda asked when the accident occurred. R.p. 323.